UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| INDUSTRIAL TOWER AND WIRELESS, LLC, | * * * | |
| Plaintiff, | * * | |
| v. | * * | 14-cv-13276-ADB |
| DAVID HADDAD, KIMBERLY BIELAN, MATTHEW McNAMARA, and PATRICIA JOHNSON, as they are members of the ZONING BOARD OF APPEALS OF THE TOWN OF FALMOUTH, | * * * * * * | |
| Defendants. | * | |

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BURROUGHS, D.J

## I.      INTRODUCTION

This case involves a local zoning dispute over the construction of a cell phone tower. On July 29, 2014, the Zoning Board of Appeals for the Town of Falmouth (the "ZBA" or the "Board") denied Plaintiff Industrial Tower & Wireless, LLC's application for a Special Permit to construct a wireless communications tower on a parcel of land located at 284 Old Meeting House Road, Falmouth, Massachusetts. Thereafter, Plaintiff ("ITW") filed a Complaint with this Court, arguing that the ZBA's decision violates the Federal Telecommunications Act of 1996 (the "TCA") on two independent grounds. First, ITW asserts in Count I that the ZBA's decision denying the application was not supported by "substantial evidence," as required by the TCA, 47 U.S.C. § 332(c)(7)(B)(iii). Second, ITW argues in Count I that even if the ZBA's decision was supported by substantial evidence, denying ITW's application has the practical effect "of

prohibiting the provision of personal wireless services," in contravention of the TCA, 47 U.S.C. § 332(c)(7)(B)(i)(II). ITW seeks to vacate the ZBA's decision, and further requests an injunction ordering the ZBA to issue the necessary permitting and authorize construction of the cell tower.

Before the Court is ITW's Motion for Summary Judgment, filed on January 29, 2015 [ECF No. 23], along with a supporting Memorandum of Law [ECF No. 24]; a Statement of Material Facts pursuant to Local Rule 56.1 [ECF No. 25]; and several Affidavits in support [ECF Nos. 26-30]. The Defendants[1] filed a Memorandum in Opposition to ITW's Motion for Summary Judgment on February 19, 2015 [ECF No. 32], but they did not challenge ITW's Local Rule 56.1 Statement of Material Facts. ITW filed a Reply Memorandum on March 5, 2015 [ECF No. 33]. The Court held a hearing on ITW's Motion on April 28, 2014.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 332(c)(7)(B)(v).[2] Having carefully considered the parties' written submissions and oral arguments, and in accordance with Congress' directive that TCA claims should be heard and decided "on an expedited basis," 47 U.S.C. § 332(c)(7)(B)(v), the Court hereby <u>ALLOWS</u> ITW's Motion for Summary Judgment, for the reasons set forth herein.

---

[1] Defendants are the individual members of the Zoning Board of Appeals for the Town of Falmouth: David Haddad, Kimberly Bielan, Matthew McNamara, and Patricia Johnson.

[2] The TCA provides that "[a]ny person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction." 47 U.S.C.A. § 332(c)(7)(B)(v).

## II.    STATEMENT OF FACTS[3]

Plaintiff Industrial Tower and Wireless, LLC is part of a family of companies that provide telecommunications services in New England and Florida [ITW's Rule 56.1 Statement of Material Facts, ECF No. 25 ("ITW Facts") ¶ 1]. Together with these related companies, ITW constructs, owns, and operates a network of personal wireless service facilities, including communications towers, transmitters, and antennae, that are used by carriers such as Metro PCS, Verizon Wireless, and AT&T to support their cellular networks [Complaint & Answer, ¶ 14; see Affidavit of Jeffrey Angley, ECF No. 26 ("Angley Aff."), Exh. 3, pp. 1-2]. These wireless facilities also support a Specialized Mobile Radio system that provides two-way radio communications for local public safety, emergency response, and school bus services, among other uses [ITW Facts ¶ 9]. ITW's particular role is to acquire, lease, and develop property on which to build wireless communications towers and supporting facilities [Id. ¶ 4]. ITW owns and operates approximately 100 such tower facilities in New England [Id.; see Affidavit of Michael J. Umano, ECF No. 16 ("Umano Aff.") ¶ 5].

Personal wireless services use a "line-of-sight" technology, which requires radio signals to pass between towers and the end user's phone or mobile radio [ITW Facts ¶ 13]. A tower's

---

[3] Although Defendants oppose ITW's Motion for Summary Judgment, they did not file a counter-statement of material facts, in accordance with Local Rule 56.1. Consequently, the facts set forth in ITW's Rule 56.1 Statement [ECF No. 25] must be deemed admitted for purposes of this Motion. See Local Rule 56.1. The facts set forth herein are based upon the following materials submitted by ITW: (1) ITW's Local Rule 56.1 Statement of Material Facts [ECF No. 25]; (2) Affidavit of Jeffrey T. Angley [ECF No. 26], along with supporting exhibits; (3) Affidavit of Richard Voci [ECF No. 27]; (4) Affidavit of Michael Umano [ECF No. 28]; (5) Affidavit of Kevin Delaney [ECF No. 29]; and Affidavit of John Champ [ECF No. 30]. However, the Court acknowledges that in determining whether the ZBA's decision was supported by "substantial evidence," the Court is limited to considering the administrative record. See Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 22 (1st Cir. 2002). Thus, the Court's analysis of the substantial evidence issue will be limited to evidence contained in the administrative record before the ZBA.

location is carefully selected so that its coverage area overlaps with those of other towers, such that the entire network provides contiguous and continuous coverage to wireless users traveling in a given area [Affidavit of Kevin Delaney, ECF No. 29 ("Delaney Aff.") ¶ 7; Angley Aff., Exh. 1, at Tab 3].

To ensure that its network of towers delivers continuous, high-quality service, ITW regularly performs propagation studies that identify gaps in coverage provided by its wireless facilities [ITW Facts ¶ 14]. ITW looks for coverage gaps in its own coverage networks, as well as in the networks of the five nationwide carriers who utilize ITW's services (Sprint, T-Mobile, Verizon, AT&T, and Metro PCS) [Id.].

**A. ITW Identifies a Gap in Wireless Coverage in East Falmouth**

In January 2013, ITW conducted propagation studies of radio frequency signals in east Falmouth, Massachusetts, using a type of computer modeling that is widely accepted in the industry [Id. ¶¶ 15-17; Angley Aff. Exh. 6, pp. 8-9].[4] These studies indicated that there was a significant coverage gap in east Falmouth along a two-mile stretch of Sandwich Road, and over one-mile-long portions of Old Barnstable Road, Route 28 and John Parker Road, which affected the networks of Verizon, AT&T, and Metro PCS (the "Coverage Gap") [ITW Facts ¶ 18; Angley Aff. Exh. 2, at Tabs 14, 15, & 16; Exh. 4, at Exhibit 1]. In addition, Verizon Wireless and Metro PCS each conducted their own propagation studies, which confirmed the existence of the Coverage Gap identified by ITW [Angley Aff., Exh. 1, at Tab 3; Exh 2, at Tabs 14 & 16]. The results of the propagation studies were further corroborated through "drive tests," which tested

---

[4]See Nextel Commc'ns of Mid-Atl., Inc. v. Town of Sudbury, No. CIV.A. 01-11754-DPW, 2003 WL 543383, at *12 (D. Mass. Feb. 26, 2003) (noting that coverage maps "are commonly relied upon by wireless carriers, zoning boards, and courts to determine the extent of coverage in a given locality").

network coverage for AT&T and Metro PCS in the areas where the propagation studies had indicated poor coverage [ITW Facts ¶ 20; Angley Aff., Exh. 4, at Exhibit 2]. Verizon also conducted an independent drive test in the area [Id.]. All of the drive tests confirmed that none of these carriers had adequate signal strength within the Coverage Gap identified by ITW [ITW Facts ¶ 22]. Further, Verizon Wireless provided ITW with its blocked and dropped-call data maps, which showed that Verizon customers experienced more service issues within the Coverage Gap than in other areas of Falmouth [Id. ¶ 23; Angley Aff., Exh. 4, at Exhibit 3].

The Coverage Gap affects a substantial number of users, as Route 28, Old Barnstable Road, and Sandwich Road carry significant amounts of local traffic. ITW submitted evidence showing that the roads and highways within the Coverage Gap are traveled by up to 30,000 users daily, based on traffic data compiled by the Massachusetts Highway Department [Angley Aff. Exh. 4, at Exhibit 5].

**B. ITW Searches for Feasible Sites to Fill the Coverage Gap**

After confirming the existence of the Coverage Gap, ITW then conducted a search for nearby properties capable of hosting a cell tower that would remedy the gap [ITW Facts ¶ 32; Affidavit of John Champ, ECF No. 30 ("Champ Aff.") ¶¶ 5-6; Angley Aff. Exh. 4, pp. 7-8]. ITW's primary goal was to augment coverage between Thomas Landers Road and East Falmouth Highway (Route 28), and thus it searched for a potential tower location that could provide service to this area, in coordination with existing cell towers in the vicinity [ITW Facts ¶ 34; Champ Aff. ¶ 8; Angley Aff. Exh. 4, pp. 7-8]. ITW established a search ring with a radius of approximately 1 mile, extending easterly of Sandwich Road and westerly of Old Barnstable Road between Thomas Landers Road and Route 28 (the "Search Ring") [ITW Facts ¶ 35; Angley Aff. Exh. 4, p. 7 and Exhibit 6]. The most optimal coverage would exist in the middle of

the Search Ring, with the quality of coverage declining as one moved towards the periphery [ITW Facts ¶ 36]. ITW determined that there were 1340 separate parcels of land located within the Search Ring [Id. ¶ 38; see Angley Aff., Exh. 4, at Exhibit 6 (map of parcels within Search Ring)].

ITW evaluated each of these 1340 parcels for location, size, frontage, view shed, access, topography, driveway construction, utility construction, setbacks, and other design criteria relevant to suitability for telecommunications site development [ITW Facts ¶ 37; Champ Aff. ¶ 11; Angley Aff. Exh. 4, pp. 7-8, and Exhibits 6 & 7; Angley Aff. Exh. 2, at Tab 26]. A vast majority of the 1340 parcels (indeed, all but 18 of them) were summarily eliminated because they were simply too small to comply with regulatory setback requirements, and/or because they had existing structures or dwellings that would interfere with those setback requirements [Angley Aff., Exh. 2 at Tab 26; Exh. 4, p. 8 & Exhibit 7; Exh. 7, p. 21; Champ Aff. ¶ 12]. Of particular concern to ITW were the setback regulations of the Cape Cod Commission ("CCC"), whose approval would be required before ITW could construct a wireless tower [ITW Facts ¶ 39; see Champ Aff. ¶¶ 10-12]. [5]

ITW then conducted an in-depth analysis of the remaining 18 parcels that were sufficiently large to accommodate its proposed tower [ITW Facts ¶¶ 43-44; Champ Aff. ¶¶ 10-

[5] The Cape Cod Commission is a regional land-use planning, economic, and regulatory agency created by the Massachusetts Legislature in 1990. The CCC has broad powers to regulate "developments of regional impact" on Cape Cod. See 1990 Mass. Acts ch. 716, § 1(b). Per the CCC's regulations, any wireless facility taller than 35 feet is presumed to be a development of regional impact and requires CCC approval. See Chapter A, Enabling Regulations of the Code of Cape Cod Commission Regulations of General Application, Section 3(i)(1). In order for a wireless facility to be approved under CCC regulations, the Commission requires, among other things, a setback of at least the height of the wireless tower [ITW Facts ¶ 39; CCC Technical Bulletin 97-001, Guidelines for DRI Review of Wireless Communications Towers].

19]. By process of elimination, ITW determined that 17 of these parcels were not feasible sites for a cell tower, because they all had one or more of the following defects: (a) lack of adequate tree cover and visual screening;[6] (b) inadequate elevation for purposes of radio frequency transmission; (c) lack of frontage; (d) property was subject to restrictive covenants; (e) property was not available for sale; (f) property was subject to protected wetlands; and/or (g) property was located within a 3000 foot "Search and Rescue" fly zone between Otis Air Force Base and the Falmouth coast line, which cannot accommodate any structure exceeding 100 feet in height [ITW Facts ¶¶ 39-44; Champ. Aff. ¶¶ 16-17; Angley Aff. Exh. 4, at Exhibit 7; Angley Aff. Exh. 2, at Tab 26]. ITW determined that out of the 18 remaining parcels, only the property at 284 Old Meeting House Road in Falmouth (the "Subject Property") was a suitable for hosting a cell tower, as it was the only parcel that (a) met the size, setback, and buffering requirements of the CCC; (b) satisfied the coverage problems identified by ITW; (c) was available for lease; and (d) was located outside the Search and Rescue fly zone [ITW Facts ¶¶ 45, 48; Champ Aff. ¶ 17; Angley Aff. Exh. 4, pp. 7-8 & Exhibit 7; Angley Aff. Exh. 2, at Tab 26]. Furthermore, the Subject Property stood out amongst all other parcels in the Search Ring, in terms of the well-established and mature vegetated buffer of trees and woodlands at the site, which could provide visual screening for a wireless tower [Champ Aff. ¶ 19].

The Subject Property on Old Meeting House Road is a 19.7 acre parcel owned by the Midway Trap and Skeet Club of Falmouth, Inc. [ITW Facts ¶ 50]. ITW has entered into a long-term lease with the owners of the Subject Property, which would allow ITW to access, construct,

---

[6] CCC regulations require all wireless facilities to be camouflaged within an existing structure, blocked from public view by structures, or surrounded by a year-round vegetated buffer. [Champ Aff. ¶ 13; CCC Technical Bulletin 97-001, Guidelines for DRI Review of Wireless Communications Towers].

and operate its proposed wireless facility on the grounds [Id. ¶ 54]. Specifically, ITW intends to build a 150-foot wireless communications tower and equipment compound within a 10,000 square foot area surrounded by a chain link fence (the "Proposed Facility"). The Proposed Facility would be located in an area on the northwest corner of the Subject Property, and surrounded by heavily-wooded and naturally-vegetated land [Angley Aff. Exh. 2, at Tab 24; Exh. 4, at Exhibit 9; Exh. 5, at Exhibit 8].

### C. ITW Applies to the ZBA for a Special Permit

Because the Subject Property is in an Agricultural zoning district under the local Zoning Bylaw, ITW required a Special Permit from the Falmouth Zoning Board of Appeals in order to proceed with development and construction. On October 21, 2013, ITW filed an application with the ZBA for a Special Permit to build a 150-foot, monopole-style telecommunications tower and equipment compound on the Subject Property [ITW Facts ¶¶ 51, 85]. Three cellular carriers, Verizon Wireless, AT&T Mobility, and MetroPCS, sought to co-locate on the tower and joined with ITW as co-applicants [Id. ¶¶ 53, 85].[7] Before taking any action on ITW's application, the ZBA referred the application to the Cape Cod Commission for its approval [Angley Aff. Exh. 11].[8]

### 1. Proceedings before the Cape Cod Commission

ITW's application underwent a five-month-long approval process before the CCC. The Commission scrutinized numerous aspects of ITW's Proposed Facility for compliance with its

---

[7] ITW's monopole is designed with space for up to five carriers. Thus, space will remain for two future carriers [ITW Facts ¶ 53].

[8] CCC regulations require municipalities on Cape Cod to refer any proposed "Development of Regional Impact" to the CCC for its approval. See Chapter A, Enabling Regulations of the Code of Cape Cod Commission Regulations of General Application, Section 2.

regulations. For example, the CCC required ITW to show that there were sufficient vegetation buffers at the site to protect adjacent agricultural land and mitigate the visual impact of the facility [ITW Facts ¶ 93]. The CCC also assessed the Proposed Facility's impact on the surrounding groundwater [Id. ¶¶ 97-99], the adequacy of road access to the facility [id. ¶ 100], and noise emissions from the facility [Id. ¶ 102]. In addition, the CCC conducted site visits and visibility tests to determine the Proposed Facility's visual impact on the surrounding areas [Id. ¶ 89]. The CCC further required ITW to pay for an independent consultant to review the propagation studies, drive tests, and dropped-call data provided by ITW and its co-applicants [Id. ¶¶ 90-91]. Based on the information provided by ITW and the carriers, the independent consultant agreed with ITW's conclusions that (1) none of the carriers had adequate signal levels within the Coverage Gap; and (2) the carriers' coverage problems would be mostly corrected by the addition of the proposed cell tower on the Subject Property [Angley Aff., Exh. 4, at Exhibit 4].

After nearly five months of review, on March 13, 2014, the CCC approved ITW's application, subject to numerous conditions [Id. ¶ 87]. The CCC's findings were set forth in a 36-page Decision [Angley Aff. Exh. 3]. The CCC found that the Proposed Facility "avoids adverse visual impacts to scenic resources through its siting well within a wooded landscape and set well back from scenic roads and vistas." [Id. p. 24]. The CCC further found that (1) there was a coverage gap in the area to be covered by the proposed wireless tower; (2) existing cell towers in the area were inadequate to remedy the problem; and (3) the height of ITW's proposed tower was the minimum necessary height to accommodate all the current and future carriers and provide adequate coverage [Id. pp. 28-29].

## 2. Proceedings before the Falmouth Zoning Board of Appeals

Concurrently with the CCC process, the Zoning Board of Appeals for the Town of Falmouth began its own administrative proceedings on ITW's Application for a Special Permit under the Town of Falmouth Zoning Bylaw (the "Bylaw"). While the Town of Falmouth does not have a bylaw specifically regulating the construction of wireless communication towers, Section 240-38 of the Bylaw allows the ZBA to authorize the development of television or radio antennas exceeding 50 feet by Special Permit [Angley Aff., Exh. 12, Section 240-38]. The applicable standard for issuing a Special Permit is set forth in Section 240-216 of the Bylaw, which provides that:

> [T]he special permit granting authority shall grant a special permit only upon its written determination that the proposed use will not have adverse effects which overbalance its beneficial effects on either the neighborhood or the Town, in view of the particular characteristics of the site . . . .

[Id., Section 240-216]. Section 240-216 further provides that the ZBA's determination "shall indicate that the proposed use will be in harmony with the general purpose and intent of this chapter," and that it "shall include consideration" of a number of factors, including, inter alia, (A) the adequacy of the site in terms of size for the proposed use; (B) the suitability of the site for the proposed use; (C) the impact on traffic flow and safety; (D) the impact on neighborhood visual character, including views and vistas; (E) the adequacy of method of sewage disposal, source of water and drainage; (F) the adequacy of utilities and other public services; (G) the effect of the proposed project on the adequacy of the supply of affordable housing in the Town; . . . and (I) compliance with all applicable sections of the zoning bylaws. [See id.].

The ZBA opened a public hearing on ITW's application on December 5, 2013, but it continued the hearing pending a decision from the CCC [Angley Aff. Exh. 11]. After the CCC rendered its decision on March 13, 2014, proceedings before the ZBA resumed. On May 1, 2014,

a public hearing was convened; ITW presented testimony on its proposed wireless facility; and public comments were heard [Id.]. The ZBA requested additional submissions from ITW, and the hearing was continued to June 5, 2014, at which time ITW presented further testimony and additional public comments were heard [Id.].

Over the course of these proceedings, ITW supplied the ZBA with extensive written submissions, including an application package [Angley Aff. Exh. 1] and all of the materials it had presented to the Cape Cod Commission, including, inter alia, the propagation studies, test drive data, dropped call maps, the CCC's independent consultant's review, sound studies, and the results of two visibility tests conducted around the Subject Property [Angley Aff. Exh. 2, 4, & 5; Complaint & Answer, ¶ 105]. These written materials were supplemented by live testimony from ITW's Engineering & Regulatory Compliance Manager, Kevin Delaney, who spoke to the Board concerning the steps ITW took to identify the Coverage Gap, and to evaluate the visual impact of the Proposed Facility [Angley Aff. Exh. 6, pp. 5-11, 28-29, 30-31, 100-1-1; Exh. 7, pp. 5-8, 17-18, 20, 26-27]. ITW also presented testimony from ITW's Site Acquisition Specialist John Champ, who testified regarding ITW's process of identifying and selecting potential parcels on which to construct a cell tower [Angley Aff. Exh. 7, pp. 15-16, 24-25, 33-35]. This testimony was supported by written reports which catalogued all 1340 parcels of land within the Search Ring, and stated the reason(s) why each parcel was eliminated from consideration [Angley Aff. Exh. 2, at Tab 26; Angley Aff. Exh. 4, at Exhibit 7].

ITW further demonstrated that it had undertaken significant efforts to evaluate and mitigate the visual and environmental impacts of the proposed tower on the Subject Property. It noted that the tower would be set back nearly 190 feet from the nearest lot line, and 590 feet from Old Meeting House Road [ITW Facts ¶ 58; Angley Aff. Exh. 9]. ITW also presented

evidence that the Proposed Facility would be surrounded by heavily-wooded and naturally vegetated land, making the tower well-screened from area roads and dwellings [ITW Facts ¶¶ 59-60]. In addition, the tower would be constructed as a monopole-style structure, which maintains a narrow profile to the eye, and manufactured with a silver/gray coating designed to blend into the skyline [Id. ¶ 62]. ITW also conducted two "balloon tests," which aimed to visually simulate the appearance of the tower by flying a large red balloon 150 feet above the site of the Proposed Facility.  Those balloon tests indicated that the tower would not be visible from most public ways surrounding the Subject Property, with the exception of one stretch of property north of the site [Angley Aff., Exh. 4, at Exhibit 9; Exh. 5; Exh. 6, pp. 10-13, 23-29, 45-46]. With respect to minimizing light emissions, ITW explained that it intended to install specialized lighting on the tower designed to emit no downward light into the surrounding areas [ITW Facts ¶ 63]. ITW also hired an independent consultant to perform sound studies evaluating the noise impact of the tower's generators and submitted those findings to the ZBA [Id. ¶ 81; Angley Aff. Exh. 2, at Tab 20]. The consultant determined that the proposed facility would comply with all sound regulations of the Town of Falmouth, the CCC, and the Massachusetts Department of Environmental Protection [ITW Facts ¶ 82].

During the public hearings, several neighboring residents spoke in opposition to the proposed tower, citing concerns for: (1) property devaluation and salability of future homes constructed near the tower; (2) possible health impacts from radio frequencies;[9] (3) noise from

_____

[9] The TCA expressly provides that a state or local government may not regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [Federal Communication] Commission's regulations concerning such emissions." 47 U.S.C.A. § 332(c)(7)(B)(iv). Here, ITW submitted evidence to the Board that the radiation

the tower facility; and (4) the visibility of the tower from various points in the neighborhood, including their own private dwellings [Angley Aff. Exh. 6, pp. 59-96; Exh. 7, pp. 35-60, Exh. 11]. Some residents also questioned the need for an additional tower, stating that they had not personally experienced a lack of cellular service in the area [Angley Aff. Exh. 6, pp. 62, 86, 90, Exh. 7, pp. 39, 51]. In addition to these comments at public hearings, there were nineteen letters of opposition, and one letter of concern filed with the ZBA [Angley Aff. Exh. 11]. The Falmouth Police and Fire departments also submitted statements to the ZBA relating to wireless coverage issues [Id.].[10]

After certain residents complained about the quality of the first balloon tests conducted by ITW, the ZBA requested that ITW perform a third balloon test. ITW complied, and the balloon test was publicly noticed so that local property owners could view the height of the proposed tower [ITW Facts ¶¶ 119-120; Angley Aff. Exh. 6, pp. 76-77, 84, 104-105]. ITW took photographs of the balloon from various roadways around the site, which were submitted to the ZBA [Id. ¶ 121; Angley Aff. Exh. 4, at Exhibit 9, Exh. 5].

In addition to submitting evidence to the ZBA, ITW also provided a legal Memorandum in Support of its application for a Special Permit, which argued two points to the ZBA: first, that denying ITW's application would constitute an "effective prohibition" under the Federal Telecommunications Act of 1996, and second, that ITW was entitled to a Special Permit because

exposure of the Proposed Facility would not exceed one percent of the current radio frequency emissions guidelines [Angley Aff. Exh. 2, at Tab 17; Angley Aff. Exh. 6, pp. 97-98].

[10] These statements are not in the administrative record before the Court, but discussions of those statements during public hearings suggests that the Police and Fire departments told the ZBA that they did not experience coverage issues that threatened the public safety [See Angley Aff. Exh. 6 & 7].

the proposed tower met all the criteria under the local Zoning Bylaw [Angley Aff. Exh. 4]. As explained below, the ZBA's reasons for denying ITW's application ultimately focused on the TCA issues, and not on the Bylaw criteria.

### D. The ZBA's Decision

On June 5, 2014, the ZBA closed the public hearings and took the matter under advisement until its July 17, 2014 Board meeting [Angley Aff. Exh. 11]. At the July 17th meeting, which was attended by four voting members and one non-voting member of the Board,[11] the members discussed their respective positions on ITW's application and then proceeded to a vote [Id.] Two members voted in favor of issuing the Special Permit, and two members voted against it. Because four affirmative votes were required to issue a Special Permit, ITW's application was denied [Id.].

On July 29, 2014, the ZBA issued a document titled "Findings and Decision," ("Decision"), from which ITW now appeals [Id.]. The ZBA's Decision, however, does not contain any findings or a statement of reasons for its denial. Defendants explain that this "is most likely due to the inability of the board to agree on a disposition . . . ." [Opposition, ECF No. 32, p. 3]. The Decision does, however, contain a procedural history of ITW's application, as well as meeting minutes from the public hearings and Board meetings [Angley Aff. Exh. 11]. ITW has also provided copies of the hearing and Board meeting transcripts as part of the administrative record [Angley Aff. Exh. 6, 7, & 8].

---

[11] Member Zylinski attended some public hearings and board meetings, but he was no longer a member of the Board when the ZBA proceeded to a vote [Angley Aff. Exh. 8 p. 6]. Member Cool also attended the Board meeting on July 17 as a non-voting member [Id. p. 10].

After reviewing both the meeting minutes appended to the Board's Decision and the transcripts of the Board meetings, the Court finds that these documents sufficiently reveal the reasons why the two no-voting Board members denied ITW's application for a Special Permit.[12] The first no-voting member, Defendant McNamara, cited three areas of concern: first, he acknowledged that the evidence suggested a "gap" in wireless coverage, but he could not reach the conclusion that it was a "significant gap." [Angley Aff. Exh. 11, pp. 8-9; Exh. 8, pp. 6-8]. He also noted a lack of evidence as to the number of wireless users who were actually affected by the Coverage Gap [Angley Aff. Exh. 8, pp. 7-8]. Second, Mr. McNamara stated that he "was not sure that I feel that there has been a full effort to evaluate other available alternatives" to the Subject Property [Id., pp. 8-9]. In support of this statement, he noted that one local farm owner had testified at a hearing that ITW never contacted him about potentially siting the tower on his property [Id.] Third, Mr. McNamara noted that the burden of proof under the TCA was "on the applicant" to prove that there are "no alternative sites that would solve the problem." [Id. p. 9]. He was not satisfied that ITW had presented sufficient reasons for eliminating one alternative parcel located at 44 Turner Road [Id. pp. 9-10].

The second no-voting member, Defendant Haddad, also stated his reasons for opposing ITW's application at the Board Meeting [Angley Aff. Exh. 11, p. 9; Exh. 8, pp. 12-14]. He echoed Mr. McNamara's observation that the applicant has the burden of proving that there were

---

[12] In T-Mobile South, LLC v. City of Roswell, Georgia, 135 S.Ct. 808, 818 (2015), the Supreme Court held that although the TCA requires local governments to provide reasons when they deny cell phone tower siting applications, the statute "does not require localities to provide those reasons in written denial letters or notices themselves." Rather, a local government "may satisfy its statutory obligations if it states its reasons with sufficient clarity in some other written record issued essentially contemporaneously with the denial." Id. ITW has not argued that the ZBA failed to comply with this requirement, and the Court finds that the reasons for the two no-voting members' opposition can be gleaned from the minutes of the Board meeting at which ITW's application was considered [Angley Aff., Exh. 8 & 11].

no other feasible sites, and he suggested that ITW had not satisfied its burden [Angley Aff. Exh. 8, p. 13]. Mr. Haddad said that he was inclined to oppose the application because "I don't know if I can buy into this spot being the spot . . . ." [Id. p. 14]. With regard to the coverage gap, Mr. Haddad stated that "I never heard anyone mention they had dropped coverage" in the area, and he further noted that all the data on this point had been provided by ITW [Id.].

Following the ZBA's Decision, on August 15, 2014, ITW timely filed its Complaint with this Court. See 47 U.S.C.A. § 332(c)(7)(B)(v).

## III. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate where the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted).

"[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (internal quotations and citation omitted). In reviewing the record, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted). The First Circuit has noted that although this standard "is favorable to the nonmoving party . . . it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir.

2011). "The factual conflicts upon which he relies must be both genuine and material," <u>Gomez v. Stop & Shop Supermarket Co.</u>, 670 F.3d 395, 396-97 (1st Cir. 2012), and the court may ignore "conclusory allegations, improbable inferences, and unsupported speculation." <u>Cochran</u>, 328 F.3d at 6 (quoting <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990)).

**B. Judicial Review Under the Federal Telecommunications Act**

The TCA has been described as a "deliberate compromise between two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." <u>Town of Amherst, N.H. v. Omnipoint Commc'ns Enterprises, Inc.</u>, 173 F. 3d 9, 13 (1st Cir. 1999). Accordingly, the TCA generally preserves all state and local authority over the placement and construction of wireless cell towers, subject to five key limitations. <u>See</u> 47 U.S.C. § 332(c)(7); <u>Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals</u>, 297 F.3d 14, 19 (1st Cir. 2002). Two of those limitations are applicable to this case.

**1. Substantial Evidence Standard**

First, the TCA requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). This substantial evidence requirement preserves the decision-making authority of local zoning boards, "while protecting wireless service providers from unsupported decisions that stymie the expansion of telecommunication technology." <u>Town of Kingston, N.H.</u>, 303 F.3d at 94. Requiring a denial to be supported by substantial evidence is "a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable zoning requirements." <u>Id.</u> (quoting O<u>mnipoint Commc'ns MB Operations, LLC v. Town of Lincoln</u>, 107 F.Supp.2d 108, 115 (D. Mass. 2000)). When

evaluating whether a local board's decision is supported by substantial evidence, the court is confined to the administrative record before the board, <u>Plainville Zoning Bd. of Appeals</u>, 297 F.3d at 22, and it must review that written record as a whole. <u>Green Mountain Realty Corp. v. Leonard</u>, 688 F.3d 40, 49-50 (1st Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Id.</u> (internal quotations and citation omitted). Although this test is "fairly deferential" to the opinion of the local zoning board, and a reviewing court "is not free to substitute its own judgment for that of the local authority," <u>T-Mobile Northeast LLC v. City of Lowell</u>, No. 11-11551-NMG, 2012 WL 6681890, *7 (D. Mass. Nov. 27, 2012) (quoting <u>Town of Lincoln</u>, 107 F.Supp.2d at 115), courts have also warned that "substantial evidence review is not a rubber stamp." <u>Green Mountain Realty Corp.</u>, 688 F.3d 50 (internal quotations and citation omitted). A local board "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." <u>Id.</u> (internal quotations and citation omitted).

## 2. Effective Prohibition Standard

Second, the TCA provides that in regulating the placement and construction of wireless facilities, local governments "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). This limitation applies "even where a local authority's denial of an individual application pursuant to its own local ordinances is supported by substantial evidence." <u>Green Mountain Realty Corp. v. Leonard</u>, 750 F.3d 30, 38 (1st Cir. 2014) ("<u>Green Mountain II</u>").  And in contrast to the substantial evidence issue, whether a denial constitutes an "effective prohibition" in violation of the TCA is a question decided by the federal district court in the first instance. <u>Id.</u> at 38-39. Thus, "where a local authority purports to pass upon the issue, the federal courts afford it 'no special deference.'" <u>Id.</u> at 39 (citation

omitted). In addition, when analyzing the "effective prohibition" question, the district court is not limited to the administrative record before the local zoning board, and it may consider additional evidence presented by the parties. Id. Ultimately, whether an effective prohibition has occurred "is a factual question for the trial court to resolve." Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 52 (1st Cir. 2009).

A state or local government need not issue a blanket ban on cell towers to violate the TCA's anti-prohibition clause. See Second Generation Properties, L.P. v. Town of Pelham, 313 F.3d 620, 629 (1st Cir. 2002). The First Circuit has identified two sets of circumstances in which a local board's denial of an individual application for a cell tower may constitute an effective prohibition of personal wireless services. Id. at 630. "The first is where the town sets or administers criteria which are impossible for any applicant to meet." Id. The second, which ITW argues is applicable here, arises "where the plaintiff's existing application is the only feasible plan," such that denying the application effectively amounts to a prohibition on personal wireless service in the area. Id. Courts have noted that "[w]hether or not an effective prohibition has occurred depends on each case's unique facts and circumstances . . . . " Green Mountain II, 750 F.3d at 40. The applicant bears the burden of proving an effective prohibition, City of Cranston, 586 F.3d at 50, and the First Circuit generally requires proof that (1) there is a "significant gap" in coverage, and (2) the local zoning board has rejected the "only feasible plan," which was that proposed by the applicant. Id.

In deciding whether the coverage gap is significant, the court "should consider, inter alia, the physical size of the gap, the area in which there is a gap, the number of users the gap affects, and whether all of the carrier's users in that area are similarly affected by the gaps." Id. at 49. "Also relevant could be data about percentages of unsuccessful calls or inadequate service during

calls in the gap area." Id. And with respect to showing that the applicant's plan is the "only feasible plan, "[t]he burden is on the [applicant] to prove it 'investigated thoroughly the possibility of other viable alternatives' before concluding no other feasible plan was available.'" Id. at 52 (quoting VoiceStream Minneapolis, Inc. v. St. Croix County, 342 F.3d 818, 834-35 (7th Cir. 2003)). This burden has been described as a "heavy" one, as the applicant must demonstrate, based on the language and surrounding circumstances, "not just that *this* application has been rejected but that further reasonable efforts [to find another solution] are so likely to be fruitless that it is a waste of time even to try." Green Mountain II, 750 F.3d at 40 (emphasis and alterations in original) (quoting City of Cranston, 586 F.3d at 50).

The material facts in this case are undisputed, and a review of the ZBA's Decision and the underlying record reveals that the Zoning Board of Appeals' Decision is in violation of both the TCA's "substantial evidence" standard and the "effective prohibition" rule.[13] Consequently, ITW is entitled to judgment as a matter of law.

### C. The ZBA's Decision Was Not Supported By Substantial Evidence

The Court agrees with ITW that the ZBA's decision was not supported by substantial evidence. More precisely, the ZBA applied the wrong legal standard, because its reasons for denying ITW's application are grounded in the TCA, and not in the local Bylaw.

It is the local zoning Bylaw which provides the applicable standard for issuing a Special Permit, and it is with reference to this standard that the Court must evaluate the "substantial evidence" question. See Town of Amherst, N.H, 173 F.3d at 14 (noting that the "substantial evidence" requirement "surely refers to the need for substantial evidence *under the criteria laid*

---

[13] Although either violation would be grounds for awarding summary judgment to ITW and issuing the requested injunctive relief, the Court will address both legal issues in this decision.

*down by the zoning law itself*) (emphasis in original); <u>accord</u> <u>T-Mobile Cent., LLC v. Unified</u> <u>Gov't of Wyandotte Cnty., Kansas City, Kan.</u>, 546 F.3d 1299, 1307 (10th Cir. 2008) (the court "must look to the requirements set forth in the local zoning code to determine the substantive criteria to be applied in determining whether substantial evidence existed to support the Board's decision"). Under Section 240-216 of Falmouth's zoning Bylaw, a Special Permit shall be issued upon a written determination that "the proposed use will not have adverse effects which overbalance its beneficial effects on either the neighborhood or the Town, in view of the particular characteristics of the site . . . ." [Angley Aff., Exh. 12, Bylaw, Section 240-216]. The Bylaw further instructs the ZBA to consider a number of factors in its analysis, including, <u>inter</u> <u>alia</u>, (A) the adequacy of the site in terms of size for the proposed use; (B) the suitability of the site for the proposed use; (C) the impact on traffic flow and safety; (D) the impact on neighborhood visual character, including views and vistas; (E) the adequacy of method of sewage disposal, source of water and drainage; (F) the adequacy of utilities and other public services; (G) the effect of the proposed project on the adequacy of the supply of affordable housing in the Town; . . . and (I) compliance with all applicable sections of the zoning bylaws. [<u>See</u> <u>id.</u>].

The ZBA failed to apply this standard. Instead, the Board's reasons for denying ITW's application, as stated in the meeting minutes appended to the ZBA's decision, focus almost exclusively on the question of "effective prohibition" under the federal TCA. The two no-voting Board members stated that ITW had not met its burdens of showing that there is a substantial gap in coverage, and that constructing a cell tower on the Subject Property was the only feasible plan [Angley Aff. Exh. 8, pp. 6-10, 12-18; Angley Aff. Exh. 11, pp. 8-9]. In doing so, however, the Board members applied the wrong standard to ITW's application, because the local Bylaw says

nothing about the TCA, nor does it incorporate the TCA's effective prohibition standards by reference. See Unified Gov't of Wynadotte County, 546 F.3d at 1307 ("[T]he substantial evidence inquiry does not require incorporation of the federal standards imposed by the TCA, but instead requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable *state and local law*.") (emphasis in original) (quoting MetroPCS, Inc. v. City and County of San Francisco, 400 F.3d 715, 723-24 (9th Cir. 2005)).

The First Circuit has noted that although nothing in the TCA expressly authorizes local zoning boards to consider whether their decision amounts to an 'effective prohibition' under the Act, many local boards "wisely do consider the point," because their decisions could be invalidated by the federal court if they violate the effective prohibition provisions of the TCA. Town of Pelham, 313 F.3d at 630. Here, however, the ZBA's analysis of the effective prohibition question was not a mere secondary consideration. Indeed, the ZBA's Decision reveals that the Board's no-voting members focused exclusively on the federal issue, such that they ignored the primary question before the ZBA, which was whether ITW had met the criteria for the issuance of a Special Permit under Section 240-216 of the local Bylaw.

Where a local zoning authority denies an application to build a wireless facility on the basis of criteria extraneous to the local bylaw, its decision cannot be supported by substantial evidence, as a matter of law. See City of Lowell, 2012 WL 6681890, at *9 (holding that board failed to act on the basis of substantial evidence, where the board relied on a TCA criteria not included in the applicable local ordinance); Unified Gov't of Wyandotte, 546 F.3d at 1308 ("In order [to] be supported by substantial evidence, the proffered reasons must comport with the objective criteria in existence . . . . Governing bodies cannot simply arbitrarily invent new

criteria in order to reject an application.") (alteration in original) (internal quotation and citations omitted); T-Mobile Ne. LLC v. Frederick Cnty. Bd. of Appeals, 761 F.Supp.2d 282, 286 (D. Md. 2010) ("[I]f a zoning board's decision violates a state's zoning law, as a matter of law it is not supported by substantial evidence.")

The Defendants now argue that the Board's decision was, in fact, premised on the zoning Bylaw criteria, and on two factors in particular: the "suitability of the site for the proposed use," and the "impact on the neighborhood visual character, including views and vistas." [ECF No. 32, p. 3]. The ZBA points out that it "focused the public hearing primarily on these two factors contained in section 240-216," and that it took testimony from neighborhood residents and property owners regarding adverse visual impacts and property devaluation [Id. pp. 3-4]. The Defendants are correct that several neighborhood residents spoke in opposition to ITW's proposal, and that the visual impact of the project was generally discussed at public hearings and Board meetings. However, based on a review of the Board's Decision and the meeting minutes appended thereto, these concerns were not the reason why the two no-voting Board members denied ITW's application.[14] Rather, when articulating their reasons for voting against ITW, the

---

[14] The Court notes that the ZBA's failure to include an official statement of reasons for denying ITW's application has made this analysis substantially more challenging. However, the Court rejects Defendants' suggestion that concerns for visual impact and the suitability of the site were additional reasons for denying ITW's application, because this is simply not supported by the meeting minutes appended to the Board's Decision. The two no-voting Board members were given an opportunity to state their reasons for voting against the application in the final Board meeting, and they did not mention concerns relating to visual impact or the suitability of the Proposed Site. Furthermore, the fact that issues of visual impact may have been discussed over the course of public hearings does not mean that this was an additional reason for the Board's denial of the application. During the public hearings, constituents and Board members raised a wide variety of concerns, ranging from possible effects on birds nesting in the towers, to potential health effects from radiation [Angley Aff. Exh. 11, pp. 3-4, 5-7; Angley Aff. Exh. 7, pp. 16-17, 29, 50-51, 63, 68]. Notably, Defendants do not argue that these concerns were additional reasons for denying ITW's application. Accordingly, the Court declines to find that

two no-voting members cited only "effective prohibition" issues under the TCA. The Court is limited to those reasons stated in the ZBA's Decision. As the First Circuit clearly held in Plainville Zoning Board of Appeals, "a board's decision may not present a moving target . . . ." 297 F.3d at 22. That is, "[a] board may not provide the applicant with one reason for a denial and then, in court, seek to uphold its decision on different grounds." Id. at 21; see Nextel Commc'ns of Mid-Atl., Inc. v. Town of Wayland Mass., 231 F.Supp.2d 396, 407 (D. Mass. 2002) (holding that Board could not rely on reason not stated in the Board's written opinion, "regardless of whether [that reason] would have been supported by substantial evidence"). Because the ZBA's stated reasons for denying ITW's application were not based on the Bylaw criteria, the Court finds that the Board's decision was not supported by substantial evidence. ITW is thus entitled to summary judgment on Count I of its Complaint.

### D. The ZBA's Denial of ITW's Application Amounted to an Effective Prohibition

Although ITW would be entitled to summary judgment on the issue of "substantial evidence" alone, there is an additional and alternative ground for allowing ITW's Motion for Summary Judgment and ordering the requested relief. Even assuming that the ZBA's decision had been supported by substantial evidence, the Court finds that denying ITW's application has

---

the visual impact of the project, or the suitability of the site for the proposed use, were reasons for the denial, simply because they were previously discussed at public hearings. For purposes of judicial review, the ZBA's reasons for denying the application must be limited to the reasons stated by the voting members during the Board meeting, and memorialized in the meeting minutes, which is the only written statement of reasons that the ZBA provided. See Nextel Commc'ns of Mid-Atl., Inc. v. Town of Sudbury, Mass., No. CIV.A. 01-11754-DPW, 2003 WL 543383, at *9 (D. Mass. Feb. 26, 2003) (considering reasons stated in board meeting minutes as the board's reasons for denying application). Otherwise, the Court would be required to scour the record for every stray comment or observation supporting a Board's decision. This would be at odds with the framework of judicial review under the TCA. See City of Roswell, 135 S.Ct. at 814 ("In order to determine whether a locality's denial was supported by substantial evidence . . . courts must be able to identify the reason or reasons why the locality denied the application.").

the effect of prohibiting the provision of personal wireless services in violation of the TCA, 47 U.S.C. § 332(c)(7)(B)(i)(II).

Whether or not the denial of a permit amounts to an effective prohibition under the TCA "is a factual question for the trial court to resolve," City of Cranston, 586 F.3d at 52, and one that must be decided by the district court in the first instance. Green Mountain II, 750 F.3d at 38-39. Although the ZBA discussed this issue at length during its meetings, and although certain Board members purported to make findings on this point, the Court affords these findings "no special deference" and will undertake a its own review of the evidence. Although the Court is free to consider evidence outside the administrative record, see id. at 39, the administrative record in this case is more than adequate, as ITW submitted copious amounts of information to the Board relating to the existence of a substantial gap in coverage, and the process by which the Subject Property was identified as the only feasible site. The Court notes that there do not appear to be any issues of material fact left in dispute, as Defendants have not opposed ITW's Local Rule 56.1 Statement, nor have they raised any significant issues of fact in their Opposition. Therefore, the Court will resolve the effective prohibition question on summary judgment, because the undisputed facts show that (1) there is a substantial gap in wireless coverage in East Falmouth; and (2) the Subject Property is the only feasible location on which to construct a wireless tower that will remedy this Coverage Gap.

### 1. ITW demonstrated a significant gap in wireless coverage.

As previously described, ITW submitted extensive evidence supporting the existence of a Coverage Gap in the identified portion of east Falmouth. This evidence included multiple propagation studies conducted by ITW, AT&T, and Metro PCS; drive studies conducted by both ITW and the carrier co-applicants, and Verizon's blocked and dropped-call data maps. Defendants have not successfully rebutted any of this evidence. Though Defendants complain

that "[a]ll of [ITW's] evidence consisted of computer modeling and so-called drive by collection of signal strength data" [ECF No. 32, p. 5], these types of propagation studies and drive tests are common and accepted methods of determining wireless coverage gaps. See Town of Sudbury, 2003 WL 543383, at *12 ("coverage maps are commonly relied upon by wireless carriers, zoning boards, and courts to determine the extent of coverage in a given locality); Omnipoint Holdings, Inc. v. Town of Westford, 206 F.Supp.2d 166, 168 (D. Mass. 2002) (noting applicant's use of drive tests and computer modeling to identify coverage gap); City of Cranston, 586 F.3d at 49 (data showing dropped or unsuccessful calls can be indicative of a coverage gap). Further, Defendants do not explain why ITW's propagation studies and drive tests were unreliable or otherwise insufficient. Indeed, the evidence suggests just the opposite, as these studies were peer-reviewed by the CCC's independent consultant, who agreed that they demonstrated the existence of a Coverage Gap.

Defendants also argue that "there was no supporting evidence from the community using the existing wireless communications service," and that "[p]ublic comment and written submissions considered the existing service adequate." [ECF No. 32, p. 5]. It is true that several constituents stated at public hearings that they had not personally experienced coverage issues in the neighborhood. However, the anecdotal testimony of a small number of individual residents is not sufficient to raise a genuine issue of fact as to the existence of a gap in coverage, particularly where the existence of this Coverage Gap was corroborated by tests conducted by Verizon Wireless and Metro PCS, and confirmed by an independent consultant for the CCC. See T-Mobile Ne. LLC v. City of Lawrence, 755 F.Supp.2d 286, 292 (D. Mass. 2010) (allowing summary judgment for applicant, and holding that "[u]nscientific, anecdotal evidence will not suffice to controvert the plaintiff's evidence of a coverage gap").

Consequently, the Court finds that ITW has met its burden of establishing a gap in wireless coverage, and of showing that this gap is "significant." "Whether a 'gap' constitutes a 'significant gap' depends not only on its physical size, but also, and perhaps more significantly, upon the number of customers affected by that gap." Town of Lincoln, 107 F.Supp.2d at 119. "Since wireless services, unlike more traditional communications industries, are used while in transit, a gap that straddles a heavily traveled commuter thoroughfare would be more significant than a gap that affects a small residential cul-de-sac." Id.; see also City of Cranston, 586 F.3d at 49 (considering "the physical size of the gap, the area in which there is a gap, the number of users the gap affects, and whether all of the carrier's users in that area are similarly affected by the gaps"). Here, ITW presented evidence that the Coverage Gap area included a 2-mile-long portion of Sandwich Road, and over one-mile-long portions of Route 28, Old Barnstable Road, and John Parker Road. ITW has established that these roads are heavily-traveled routes, and that they host a significant amount of daily traffic. See id. at 49 (holding that district court did not err in finding significant coverage gap on Phenix Avenue in Cranston, Rhode Island, where Phenix Avenue was a heavily-traveled and important route that connected Cranston to neighboring communities). The Court finds that ITW has met its burden of proof on this point, and that Defendants have failed to present sufficient competent evidence to rebut the existence of a substantial gap in wireless coverage.

> ## 2. There are no feasible alternative sites to host a wireless tower capable of remedying the Coverage Gap.

ITW has also met its burden of showing that the ZBA rejected what was "the only feasible plan," and that ITW had "investigated thoroughly the possibility of other viable alternatives' before concluding no other feasible plan was available.'" City of Cranston, 586 F.3d at 52 (internal quotations and citation omitted). As discussed above, ITW presented evidence that

it undertook extensive, good-faith efforts to (1) identify <u>all</u> properties located within the Search Ring, and (2) evaluate which of these properties were feasible locations for hosting a cell tower. [ITW Facts ¶¶ 39-44; Angley Aff. Exh. 4, at Exhibit 7; Angley Aff. Exh. 2, at Tab 26]. ITW has also shown how, by process of elimination, it identified the Subject Property as the only feasible location on which to construct its Proposed Facility.[15]

In response, Defendants advance two arguments, neither of which is persuasive. First, Defendants argue that that although ITW began with a list of 1340 parcels within the Search Ring, ITW "admitted the vast majority of [those] sites were inadequate for a number of valid reasons and received cursory consideration." [ECF No. 32, p. 5]. The Court reads this to suggest that ITW should <u>not</u> have summarily eliminated the more than 1320 parcels that were too small to host a cell tower, based on the setback requirements of the CCC. But, as Defendants seem to acknowledge, these parcels' categorical inability to meet setback requirements constituted a "valid" reason for removing them from consideration. Defendants do not explain how ITW could have done otherwise.

Second, Defendants suggest that ITW's "final list" of 17 parcels (other than the Subject Property at 284 Old Meeting House Road) was an "overstated submission." In other words, ITW "presented the appearance that the final site was the most convenient for ITW's purposes and not necessarily the most suitable for the community . . . ." [Id.]. Again, however, this argument ignores ITW's explanations of how it determined that each of the 17 other parcels was not a feasible location for a cell tower. [ITW Facts ¶¶ 39-44; Angley Aff. Exh. 4, at Exhibit 7; Angley Aff. Exh. 2, at Tab 26]. In many cases, the larger parcels were encumbered by wetlands; others

---

[15] ITW also established that there are no existing cell towers or structures upon which new wireless services can be located that are capable of providing coverage to the area. [Angley Aff. Exh. 4, at Exhibit 4; ITW Facts ¶ 31].

were located within the prohibited "Search and Rescue" no-fly zone. Certain parcels, including the Andrews Farm property, were home to active agricultural use, and therefore could not be the site of a cell tower under CCC regulations [Angley Aff. Exh. 4, at Exhibit 7; Champ Aff. ¶¶ 38-41]. Still other parcels may have been large enough, area-wise, to host a tower, but ITW determined that they lacked the required elevation or other characteristics necessary to host a cell tower. These reasons were set forth in documents submitted to the CCC and, subsequently, to the ZBA [Angley Aff. Exh. 4, at Exhibit 7; Angley Aff. Exh. 2, at Tab 26]. In addition to providing documentary evidence supporting its methodology, ITW made its counsel and its site-acquisition specialist available at hearings to answer questions about the feasibility of other potential sites. Each time that a Board member or constituent suggested an alternative site, ITW responded with cogent reason(s) why that site was not a feasible location for a cell tower. [See Angley Aff. Exh. 6, pp. 32-34, 52-53; Angley Aff. Exh. 7, pp. 3-4, 12, 14-16, 20-27, 54, 57-60, 81-88, 91-92].[16]

Nonetheless, two members of the Board remained dissatisfied with ITW's explanations, and they concluded that ITW had not met its burden of proof with respect to the feasibility issue [Angley Aff. Exh. 11]. The Court, however, disagrees with that conclusion. Based on a review of the meeting minutes and transcripts, it appears that the two no-voting Board members selectively ignored ITW's explanations regarding the non-feasibility of other sites. In light of ITW's

---

[16] The only parcel not addressed by ITW at the public hearings was the property located at 44 Turner Road, which Board members McNamara and Haddad cited as one example of a feasible alternative site [Angley Aff. Exh. 8, pp. 10, 13]. Although ITW did not have an opportunity to address the members' comments regarding 44 Turner Road, because the public hearing had closed, ITW has submitted affidavits in support of its Motion for Summary Judgment which further explain the numerous reasons why the parcel at 44 Turner Road was eliminated from consideration. For example, the property contained wetlands that impeded the CCC's setback requirements; it is located within the SAR; and it has inadequate Radio Frequency characteristics, such that a tower at that location would have been unable to fill the Coverage Gap [Champ Aff. ¶¶ 36-37, 42-43]. Defendants have not challenged any of these contentions.

evidence, it is difficult to understand how the Board members could have found that ITW did not make "a full effort to evaluate the other available alternatives." [Angley Aff. Exh. 8, pp. 9, 13]. Indeed, it is not clear what more ITW could have done.

The First Circuit has held that the TCA's goals of "promoting competition in the wireless communications market and of relatively speedily effectuating the purpose of the Act . . . impose their own constraints," and must "underlie the determination of feasibility." City of Cranston, 586 F.3d at 51. "Just as carriers must present evidence of their efforts to locate alternative sites, once they have done so there are limits on town zoning boards' ability to insist that carriers keep searching regardless of prior efforts to find locations or costs and resources spent." Id. at 51-52. Thus, where an applicant has "systematically searched for solutions to the gap problem using technologically reliable criteria and methodologies," Id. at 53, thoroughly explored and eliminated alternative possibilities, and reached a well-supported conclusion that a particular property is the only feasible site, the Board cannot survive summary judgment by claiming it simply wasn't convinced. As the court held in National Tower LLC v. Frey, 164 F.Supp.2d 185, 190 (D. Mass. 2001), once confronted with evidence that "no alternative site exists, the Board's obligation was either to show that [the applicant's] evidence was factually insufficient, or to come forward with evidence of its own demonstrating a trialworthy dispute."[17] Here, Defendants have done neither. And although Defendants argue that the ZBA's denial has not foreclosed the

---

[17] As Judge Stearns noted in Frey, this approach is not inconsistent with the holding in Southwestern Bell Mobile Systems, Inc. v. Todd, in which the First Circuit noted that the burden was not on the Board, in the first instance, to show that alternative sites existed. 244 F.3d 51, 63 (1st Cir. 2001), *abrogated on other grounds by* City of Roswell, 135 S.Ct. 808 (2015). In Southwestern Bell, however, the applicant had failed to present any evidence that it had undertaken an investigation to determine whether there were other feasible sites. Id. Thus, "[t]he holding in Southwestern Bell . . . does not suspend the usual rules governing summary judgment." Frey, 164 F.Supp.2d at 189-90.

eventual grant of a Special Permit to ITW, this is at odds with the record, which demonstrates that the Board rejected the only feasible plan. See Town of Pelham, 313 F.3d at 630 (holding that applicant may prove an effective prohibition by showing that town rejected the only feasible plan).

In sum, ITW has met its burden of showing that the Subject Property was the only feasible site on which to construct a cell tower that would remedy the substantial Coverage Gap in east Falmouth, and that "further reasonable efforts [to find another solution] are so likely to be fruitless that it is a waste of time even to try." Green Mountain II, 750 F.3d at 40 (alterations in original) (internal quotations and citation omitted). Thus, ITW is also entitled to summary judgment on Count II of its Complaint.

### E. Appropriate Relief

 Congress has directed that disputes under the TCA must be determined "on an expedited basis," 47 U.S.C. § 332(c)(7)(B)(v), and "[a]n award of injunctive relief, rather than a remand for further proceedings, best fulfills this statutory goal." Brehmer v. Planning Bd. of Town of Wellfleet, 238 F.3d 117, 121 (1st Cir. 2001). Consequently, the First Circuit has stated that "in the majority of cases the proper remedy for a zoning board decision that violates the [TCA] will be an order . . . instructing the board to authorize construction." Plainville Zoning Bd. of Appeals, 297 F.3d at 21-22. Although there may be some cases in which remand is appropriate, "for example, an instance of good faith confusion by a board that has acted quite promptly," id. at 24, the record in this case does not reveal any circumstances warranting remand. Therefore, the Court will issue an order requiring the Zoning Board of Appeals for the Town of Falmouth to issue the necessary permits for ITW to construct the Proposed Facility.

**IV.    CONCLUSION**

For the foregoing reasons, ITW's Motion for Summary Judgment [ECF No. 23] is

ALLOWED as to Counts I and II of the Complaint. The ZBA's July 29, 2014 Decision denying

ITW's Application for a Special Permit is hereby VACATED on the grounds that it violates the

Federal Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B), subsections (i)(II) and (iii).

The Court further ORDERS that, within forty-five (45) days from the issuance of this Order, the

Defendant members of the Zoning Board of Appeals for the Town of Falmouth shall issue all

necessary permits allowing ITW to construct and operate the Proposed Facility, in accordance

with ITW's application and plans therefore.

The Clerk is directed to enter Judgment for the Plaintiff on Counts I and II of the

Complaint in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED.**

Dated: May 18, 2015

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
DISTRICT JUDGE
